**LUNG ROSE VOSS & WAGNILD**

Grant F. Allison (10368-0)
Ivana P. Tran (11758-0)
700 Bishop Street, Suite 900
Honolulu, Hawaiʻi 96813
Telephone: (808) 523-9000
Facsimile: (808) 533-4184
E-mail: gallison@legalhawaii.com
itran@legalhawaii.com

**ASHURST PERKINS COIE US LLP**

Jean-Jacques Cabou (AZ Bar No. 022835)*
Margo R. Casselman (AZ Bar No. 034963)*
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: +1.602.351.8000
Facsimile: +1.602.648.7000
E-mail: j.cabou@ashurstperkins.com
margo.casselman@ashurstperkins.com
**Pro Hac Vice* forthcoming

*Attorneys for Plaintiff TY Management Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| TY MANAGEMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>RACE RANDLE; KAINOA CASCO; MAUI LAND & PINEAPPLE COMPANY, INC.; AND HAWAII WATER SERVICE COMPANY, INC.,<br><br>Defendants. | CIVIL NO. _______________<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff TY Management Corporation ("TY") alleges as follows:

## INTRODUCTION AND NATURE OF ACTION

1. This Complaint seeks to hold Defendants Race Randle ("Randle"), Kainoa Casco ("Casco"), Maui Land and Pineapple Company, Inc. ("MLP"), and Hawaii Water Service Company, Inc. ("HWS") accountable for repeated acts of wire fraud and mail fraud designed to steal money from TY.

2. TY recently discovered that MLP and at least two of its senior executives, Randle and Casco, have been covertly conspiring with MLP's contractor, HWS, to defraud TY into paying substantial costs that MLP is contractually obligated to bear. They did so by relabeling documents, misclassifying expenses, and inflating invoices. Without this Court's intervention, they will not stop.

3. TY owns and operates two golf courses in Kapalua, Maui. The first is the Kapalua Plantation Golf Course (the "Plantation Course"), a premier, destination course where the PGA Tour held its annual Sentry Tournament of Champions for twenty-seven years and where the LPGA Tour will, in 2027, hold its Lotte Championship. The second is the Kapalua Bay Golf Course (the "Bay Course"), a popular resort course that drew golfers from around the world (collectively, the "Courses"). TY also owns and operates the related Golf Academy in Kapalua.

4. None of those facilities can operate without irrigation water. Indeed, after months of severe restrictions on TY's irrigation water supply, TY was forced to close the Bay Course in September 2025. It remains closed today.

5. And one company, MLP, has a monopoly over TY's access to that water. Pursuant to a set of agreements, MLP delivers irrigation water to TY—and to other customers in Kapalua and parts of West Maui—through the Honokōhau Ditch System (the "Ditch System").

6. MLP, of course, charges TY and its other customers for the water they consume; MLP bills TY each month for water at a contractually set rate per 1,000 gallons. By contract, MLP can raise TY's rate to cover certain increases in the cost to "operat[e] and maintain[]" the Ditch System.

7. But MLP cannot pass through the cost of "**capital improvements, replacements or repairs**" to TY. **MLP must bear those costs.**

8. So, if MLP incurs "operations and maintenance" costs, it can make TY pay them through increased rates. But if MLP incurs capital improvement, replacement, or repair costs, MLP must pay those costs.

9. In recent years, MLP has faced substantial capital improvement, replacement, and repair costs—because MLP has long neglected the Ditch System and let it fall into disrepair. MLP was (and remains) under immense pressure from

customers, regulators, and other stakeholders to fix the Ditch System. But MLP did not want to cover these costs itself.

10. So MLP, Randle, Casco, and HWS plotted to make TY pay instead. They doctored records and relabeled projects in order to misclassify hundreds of thousands of dollars of repair, replacement, and capital improvement costs as "maintenance" costs, and used those doctored documents to pass the costs onto TY.

11. This scheme was orchestrated by Randle, MLP's Chief Executive Officer, and Casco, MLP's former Vice President of Land Productivity & Asset Management. Each personally directed that specific repair, replacement, or capital improvement costs be falsely labeled as "maintenance" and passed through to TY in its rates.

12. MLP, Randle, and Casco also sought HWS's help in executing their racketeering scheme, and HWS was (and remains) an active participant in the enterprise.

13. HWS is intimately familiar with the Ditch System and with the agreements whereby MLP is obligated to deliver water to TY, including the limitations on which costs can be passed through to TY in its rates.

14. For example, in September 2024, HWS received correspondence from MLP that explicitly stated that repair cost estimates were not applicable to TY's

rates, and by no later than December 2024, HWS had copies of TY's relevant agreements with MLP, including the rate provisions.

15. MLP pays HWS to operate and maintain the Ditch System. HWS prepares the scopes of work and cost forecasts that determine TY's rates. That role gives HWS direct control over certain documents through which the scheme is carried out.

16. According to Casco, MLP simply does what HWS tells it to do when it comes to Ditch maintenance. At a May 24, 2026 deposition in a separate lawsuit, Casco testified: "Generally [HWS] kind of tell[s] us what needs to be done on the ditch, right, and then we work with them on what might be appropriate or not. But ultimately they tell us what needs to be done." And that would make sense. After all, again according to Casco, HWS is the "regulated water entity ... they're water experts, that's their job."

17. But Casco's story is not the full picture. In fact, although HWS provides some orders and directions to MLP, Casco and Randle likewise give orders and directions to HWS. For example, Casco and Randle specifically told HWS how to prepare its cost documents, and HWS knowingly prepared and issued those documents in the way the scheme required.

18. For the 2025 HWS cost forecast (a forecast which formed the basis for the increased rates charged to TY), Randle directed HWS to include a $250,000 line

item to regrade and otherwise repair road surfaces along the entire Ditch System. This was a capital improvement or repair, not maintenance. HWS included it anyway.

19. In preparing that same 2025 forecast, Casco personally redlined HWS's draft scope of work to remove *every* reference to the word "repair" and replace it with some version of the word "maintenance."

20. In other words, Casco directed HWS to change every item that MLP had to pay for into one that MLP could pass along to TY in the form of increased rates.

21. HWS agreed to and implemented every change except one.

22. Meanwhile, Randle and others at MLP repeatedly represented in signed letters to TY that the increased costs are solely "operation and maintenance" and do not include any capital improvements, repairs, or replacements. Those representations were knowingly false, and Defendants made them to induce TY to pay costs that MLP was obligated to bear itself.

23. The scheme worked. In the last two years, MLP's purported operation and maintenance cost forecasts have risen to **nearly ten times what they were in 2022.**

24. Using these fraudulently inflated figures, MLP has drastically raised water rates for all of its customers over the past two years. Between January 2025 and 2026, MLP raised TY's water rate by 339%. And because TY depends on MLP for the irrigation water its Courses require, TY has no choice but to pay.

25. Through this scheme, MLP, Randle, Casco, and HWS have fraudulently taken—and continue to take—TY's money with each bill. Unless the Court holds them accountable, the scheme and resulting harm will continue.

26. TY brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and Hawai'i law to recover its losses and to stop the scheme.

## PARTIES

27. TY is a Hawai'i corporation with its principal place of business in Honolulu, Hawai'i.

28. Race Randle is an individual residing in Hawai'i. Randle is MLP's Chief Executive Officer.

29. Kainoa Casco is an individual residing in Hawai'i. Casco was, until very recently, MLP's Vice President of Land Productivity & Asset Management.

30. MLP is a Delaware corporation with its principal place of business in Lahaina, Hawai'i.

31. HWS is a Hawai‘i corporation with its principal place of business in San Jose, California. HWS is a subsidiary of California Water Service Group, a regulated water utility headquartered in San Jose, California.

## JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under RICO, including 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c).

33. This Court has supplemental jurisdiction over TY’s state-law claim pursuant to 28 U.S.C. § 1367 because that claim is so related to TY’s federal claims that it forms part of the same case or controversy and derives from a common nucleus of operative fact.

34. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to TY’s claims occurred in this District, including the rate-setting, work classification, and billing events, and each Defendant resides here.

## FACTUAL BACKGROUND

### I. MLP IS REQUIRED TO BEAR THE COST OF REPAIRING AND IMPROVING THE DITCH SYSTEM.

#### A. The Ditch System Supplies Irrigation Water to TY’s Golf Courses

35. MLP itself built and opened the Bay Course in 1975 and the Plantation Course in 1992. For many years, MLP operated both Courses.

36. MLP later ran into financial trouble. While warning its shareholders that it might cease to operate as a going concern, MLP sold the Courses to TY. TY bought the Plantation Course in 2009 and the Bay Course in 2010.

37. Each sale included an Agreement for Water Delivery (together, the "WDAs"). Under the WDAs, MLP must deliver non-potable irrigation water to the Courses and the Golf Academy. The two WDAs contain materially identical rate and maintenance provisions.

### B. The WDAs Bar MLP from Passing Repair and Capital Costs to TY

38. The WDAs set the rate MLP may charge TY for water, initially $0.32 per thousand gallons. MLP may adjust that rate under certain circumstances, including "commensurate with any material increase in MLP's costs in operating and maintaining the [Ditch] System, but not including the cost of any capital improvements, replacements, or repairs." WDAs § 3.

39. Unlike most providers of an essential service like water or power, MLP is not a public utility regulated by the Hawaiʻi Public Utilities Commission ("PUC"). MLP can and does change the rate it charges TY on its own, by notice, without PUC review or approval.

40. MLP also warranted that it "will at all times exercise commercially reasonable efforts to manage, repair and maintain the Ditch System in a condition adequate for the reliable delivery of water." WDAs § 6.

### C. MLP Let the Ditch System Deteriorate

41. MLP did not keep that promise. It stopped performing commercially reasonable maintenance, and the Ditch System fell into disrepair.

42. All potable and non-potable water in Kapalua is provided, at least initially, by MLP. The non-potable water is conveyed through the Ditch System. As a result, the condition of the Ditch System impacts the availability of non-potable water, which in turn affects more than just TY. Residents, farmers, hotels, and other businesses in Kapalua and parts of West Maui all depend on non-potable water from the MLP-controlled Ditch System.

43. MLP also supplies water to the County of Maui and HWS. Both the County and HWS then supply water to many others in West Maui.

44. At all relevant times, Randle, Casco, MLP, and HWS knew the Ditch System was in poor condition.

45. In 2019, the Hawai‘i Commission on Water Resource Management (“CWRM”) issued an order requiring MLP to make upgrades to the Ditch System to ensure water flow and delivery. In 2021, CWRM amended that order to accommodate MLP’s claims that certain repairs were infeasible. Yet MLP did not begin the ordered repairs until June 2025—six years after the original order.

46. By May 2025, the deterioration was plain to see. During a visit to the site, TY and its consultants observed:

- sediment and debris;
- impaired intake infrastructure;
- an inoperable or severely damaged development tunnel;
- unusable access roads; and
- a deteriorated reservoir liner.

47. The Ditch System's conditions became so bad that, in August 2025, TY and other water users sued MLP for failing to maintain it.[1]

48. In October 2025, CWRM issued a notice to MLP alleging violations of CWRM's 2019 and 2021 orders, and of the interim instream flow standard. In December 2025, CWRM fined MLP $140,000 (the maximum penalty) for twenty-eight violations of the interim instream flow standard, though it allowed MLP to use those funds to purchase monitoring equipment.

49. The Ditch System's deficiencies could not be fixed through routine maintenance. They required repair, replacement, or capital improvement, which are exactly the costs the WDAs require MLP to bear on its own and without recapture from TY.

---

[1] *See Plantation Estates Lot Owners' Association, et al. v. Maui Land & Pineapple Company*, 2CCV-25-0003632 (Aug. 18, 2025 Haw. 2d Cir. Ct.). This case is not about those failures; it's about the scheme that MLP, Randle, Casco, and HWS concocted to fraudulently increase TY's water rates.

### D. MLP Brings in HWS to Maintain and Repair the Ditch System

50. In 2019, MLP initiated a sale of portions of its Kapalua water distribution assets to HWS. At the time of the sale, MLP also shifted day-to-day maintenance of the Ditch System to HWS. MLP retained its rights in the Ditch System, the right to supply water to HWS, and the right to approve major repairs and capital improvements.

51. Two relevant agreements govern the current relationship between MLP and HWS: a Water Delivery Agreement and a Ditch Maintenance and Services Agreement (the "DMSA").

52. Under the DMSA, HWS performs (a) basic Ditch System maintenance services for a fixed monthly fee ($14,416.66 per month for the first year), subject to adjustment each year; and (b) certain repairs, capital improvements, and other services, which HWS bills MLP at actual cost plus a 15% markup. HWS therefore profits from every additional project on the Ditch System, and from MLP having the funds to pay for those projects.

## II. FACING MAJOR EXPENSES TO RESTORE THE DITCH SYSTEM, DEFENDANTS DEVISED A PLAN TO PASS MLP'S COSTS ON TO TY

### A. For the First Fifteen Years After the WDAs Took Effect, MLP Never Substantially Raised Rates

53. From the execution of the WDAs in 2009 and 2010 through 2024, MLP raised TY's rates only modestly—from $0.32 to $0.49 per thousand gallons.

### B. In 2024, Randle Admitted the Ditch System Needed Significant Repairs and Capital Improvements, and MLP Began Imposing Astronomical Rate Increases Based on Purported Cost Forecasts

54. On August 21, 2024, Randle emailed TY a signed letter announcing that water rates would increase for TY and all other non-potable water customers "[d]ue to increased operation and maintenance costs."

55. In the same letter, Randle admitted that the Ditch System needed major capital improvements, replacements, and repairs, and he asked TY to amend the WDAs to allow MLP to pass those costs on to TY.

56. But MLP did not wait for an answer. On September 12, 2024, MLP's Chief Financial Officer, Wade Kodama ("Kodama"), emailed TY a rate-change notice stating that TY's rate would increase to $2.45 per thousand gallons effective November 1, 2024—a 400% increase. The notice stated that the new rate was based on MLP's forecast that Ditch System "operation and maintenance" costs from October 2024 to October 2025 would be **$1,794,300**. The forecast was broken down into eighteen generic line items, such as $300,000 for "Road Maintenance," $150,000 for "Ditch Maintenance," $230,000 for "Upstream Vegetation and Ungulate Management," and $150,000 for "Gate Maintenance and other security."

57. TY asked for more information and financial documents to support this astronomical cost forecast. MLP refused to provide it.

58. MLP notified its other customers, including HWS, about increases in rates around this time as well.

59. On October 23, 2024, Randle sent TY a signed follow-up letter that purported to justify the increase with a brief description of each of the eighteen line-items in the 2024–2025 cost forecast. For example, Randle described the $300,000 "Road Maintenance" line as including "vegetation management" at various areas on the "approximately 18 miles of unpaved roads" used to access the Ditch System.

60. Then, on November 29, 2024, MLP emailed TY a second rate-change notice, "supersed[ing]" the prior one, stating that TY's rate would instead be $1.68 per thousand gallons, effective January 1, 2025. The notice again claimed the increase was due to higher operation and maintenance costs, and it attached a revised 2025 forecast of $1,732,500, built on the same eighteen line-items, including $300,000 for "Road Maintenance."

61. On January 1, 2025, MLP began billing TY at the new rate of $1.68.

62. With these increases, TY's rate surged from approximately $0.49 per thousand gallons to $1.68 per thousand gallons, a 243% increase.

63. On June 1, 2026, MLP emailed TY *another* notice of rate adjustment, claiming that it was again raising TY's rate due to increases in its costs to operate and maintain the Ditch System. In support, MLP provided a 2026 forecast of

**$2,488,068**—broken down into the same eighteen vague line items used in the 2024 notices.

64. Oddly, although MLP claimed every line item reflected regular maintenance and operation, its 2026 forecast for several categories was up to *three times higher* than its actual 2025 costs in those same categories.

65. For example, for "Upstream and aquifer vegetation and ungulate management," MLP forecasted $230,000 for 2025, actually spent only $170,548 in 2025, but nonetheless forecasted $518,924—over three times its actual costs—for 2026.

66. TY again requested supporting documents. MLP again provided none.

67. On July 1, 2026, MLP began billing TY at the new rate of $2.15 per thousand gallons.

68. TY's rate has now risen 339% in less than two years.

69. And TY is not alone. MLP's other customers have also been subjected to astronomical rate increases during this same period. For example, HWS's non-potable rate has risen by 653%; MLP's agricultural customers' rates have risen by 346%; and the County of Maui's rate has risen by 673%.

70. As a PUC-regulated utility, HWS is entitled to a fair rate of return. Thus, when MLP increases the rates it charges HWS, HWS in turn can pass those increases along to its end customers. HWS therefore has no incentive to object to MLP's rate increases.

71. But TY, as MLP's end customer, does not have this luxury; there is no downstream customer to whom MLP's unfair charges can be passed on.

**C. The 2025 and 2026 Forecasts Dwarfed MLP's Historical Costs**

72. In stark contrast to MLP's 2025 forecast of $1.73 million and 2026 forecast of $2.49 million, MLP's historical *actual* costs to operate and maintain the Ditch System in the three preceding years were only approximately $253,256 (in 2022), $396,438 (in 2023), and $389,696 (in 2024).

73. In other words, to justify its rate increases, MLP used forecasts that were approximately *four to ten times* MLP's actual costs in recent prior years.

74. The reason was simple. After years of neglect, MLP had finally decided to make the repairs and capital improvements the Ditch System needed. But instead of paying for them as the WDAs require, MLP put those costs in TY's rates and called them "maintenance."

### D. Casco, Randle, and HWS Worked Together to Doctor the 2025 Budget Documents to Support MLP's Grossly Inflated "Operation and Maintenance" Cost Forecasts

75. TY recently obtained documents confirming that, in preparing the 2025 MLP/HWS scope of work and budget relating to the DMSA, MLP, Randle, Casco, and HWS worked together to falsely label hundreds of thousands of dollars of repair, replacement, or capital improvement costs as "maintenance," in order to pass those costs on to TY.

76. Casco, for example, literally rewrote HWS's draft 2025 scope of work—which described HWS's proposed "repairs" to many parts of the Ditch System—to systematically scrub all references to the word "repair."

77. On May 1, 2025, following a call with HWS's Operations Manager, John Kadowaki, about the draft 2025 scope of work and budget, Casco emailed him this instruction: "Change all 'Corrective Maintenance' or 'Repairs' to Deferred Maintenance."

/ /

/ /

/ /

/ /

/ /

/ /

**From:** Kainoa Casco <kainoa@mauiland.com>
**Sent:** Thursday, May 1, 2025 1:58 PM
**To:** Kadowaki, John (Kani) <jkadowaki@calwater.com>
**Subject:** Notes from Call on System Wide Scope

This is an EXTERNAL EMAIL. Stop and think before clicking a link or opening attachments.
Thanks Kani for the call.

Here's the notes.

- Change Gates & Security System Wide to Additional Services at $20,000
- Change Road Maintenance System Wide to Additional Services at $250,000
- Change all "Corrective Maintenance" or "Repairs" to Deferred Maintenance
- Kani zeroed out System Wide HWS/MLP $173k Basic Services then added numbers to each line previously marked with X
- All red text System Wide were exclusions with placeholder budgets. Kani to confirm/edit as needed

Mahalo,

**Kainoa Casco** | *VP of Land Productivity & Asset Management*
MAUI LAND & PINEAPPLE COMPANY, INC. (NYSE: MLP)
808-385-7433 Direct
500 Office Road | Lahaina, HI 96761
mauiland.com

MAUI LAND
& PINEAPPLE COMPANY INC.

*See* Emails between K. Casco and J. Kadowaki (May 1–2, 2025), with Attachment, attached as **Exhibit 1**.

78. Casco did not ask HWS to change the work. He asked HWS to change what the work was called, so that MLP could charge TY for it, and HWS could get paid for it.

79. The next day, Casco emailed HWS a redlined version of the scope of work. The redlines changed every instance of the word "Repair," "Repairs," or "Corrective maintenance" to "Maintenance," "Maintain," "Initial Deferred Maintenance," or "Deferred Maintenance." *See* Exhibit 1.

80. Casco also helpfully summarized his own edits in a margin comment: "Changed any 'repairs' language to maintenance or deferred maintenance." *Id.*

> **Commented [KC1]:** Changed any "repairs" language to maintenance or deferred maintenance
> Kainoa Casco
> 2025-05-02 14:21:00

81. Many of Casco's edits do not even make grammatical or logical sense, confirming that they were driven by a desire to falsely alter labels, rather than to legitimately describe the work. *See id.* For example:

> **Note the following Items Are Not Included in Basic Services:**
> • ~~Repair~~ Maintain and replacement of failed equipment or infrastructure.
> • Road ~~repair~~maintenance due to landslides or washout on roadway leading to ditch infrastructure.
> • Inventory of replacement components.
> • After-hours emergency call outs or service calls in addition to routine inspections
> • The water system may be incrementally expanded or improved to meet the needs of the Owner's development. Owner and Contractor will negotiate additional service fees based upon the additional man hours required to service the expansion if necessary.
> • Increased costs to ~~repair~~maintain damage to roadways, trails, or infrastructure due to storm events
> • Initial cleaning.
> • Structural inspection, Structural maintenance, or ~~repair~~maintenance of the connecting water conduits
> (whether tunnels, siphons, ditches or otherwise).

- There is no such thing as "[m]aintenance due to landslides"; clearing a landslide is a repair. Nor would it make any sense to pay a contractor to "maintain damage to roadways, trails, or infrastructure due to storm events." Damage is repaired, not maintained. Casco's redlines are textbook financial fraud.

82. In one particularly egregious example, Casco relabeled HWS's proposed "Bridge Repair" ($35,000) to "Bridge Maintenance"; "Honolua intake bridge repair" ($30,000) to "Honolua intake bridge Maintenance"; and "Honolua intake fence repair" ($20,000) to "Honolua intake fence Maintenance." *Id.*

- Bridge ~~Repair~~Maintenance $35k

- Honolua intake bridge ~~repair~~Maintenance $30k
- Honolua intake fence ~~repair~~Maintenance $20k

83. But the bridge work that HWS recently did was not "Maintenance" by any stretch of the imagination. As shown in the before and after photographs below (taken on or around May 2025 and August 2026, respectively), the bridge was severely deteriorated and needed repair and replacement.





84. Calling this work "Maintenance" was false, and Casco and HWS knew it.[2]

85. HWS adopted Casco's changes. On May 6, 2025, Kadowaki emailed Casco and Randle a proposed "final" scope of work that implemented all of Casco's edits but one, which Kadowaki said needed to remain "repairs" or else HWS "legal [would] need to review again."

86. The May 6th email also attached a detailed Excel spreadsheet HWS used to prepare the scope of work and associated costs. That spreadsheet reveals additional mislabeling and manipulation of the numbers.

87. For example, the HWS spreadsheet includes a $250,000 line item for purported "Road Maintenance" consisting of capital improvement or repair work: gravel, regrading, water kickouts, and landslide clearing. The spreadsheet specifies that this line item was "[a]dded by MLP and included in water rate amounts" "[b]ased on discussion with RR"—i.e., Race Randle.

| Annual Estimate | Billing Category | SOV Line Iter | Access Type | Map Reference | Notes | Service Type |
|---|---|---|---|---|---|---|
| $ 250,000 | Basic Services | Access - Road | Road | 022 - Road Maintenance | Added by MLP and included in water rate amounts. Based on discussion with RR. Gravel, regrading, water kickouts, landslide clearing, etc. This is for work on road surfaces across the entire system, which is not included in HWS scope since HWS scope is primarily vegetation maintenance. | Maintenance |

---

[2] The before picture (on the left) comes from a briefing presented to CWRM on September 16, 2025, which is available at the following link (*see* page 41): https://files.hawaii.gov/dlnr/cwrm/submittal/2025/sb20250916C1.pdf. Representatives of both MLP and HWS, including Randle, attended and spoke at this meeting.

88. That description contradicts the October 23, 2024 letter that Randle himself signed and sent to TY, in which he told TY that "Road Maintenance" consisted primarily of vegetation management and was forecasted at $300,000. *See* Letter from R. Randle to TY (Oct. 23, 2024), attached as **Exhibit 2**. In addition, the HWS spreadsheet *separately* itemizes about $190,000 of vegetation management related to roads.

89. The spreadsheet also reveals other repairs, replacements, and capital improvements that MLP and HWS labeled "maintenance," including installing gates, cameras, and other security features; repairing bridges and other structures; and replacing equipment.

90. In total, MLP, HWS, Randle, and Casco mislabeled at least $447,000 of costs *in 2025 alone* as "maintenance" when in fact they were repairs, replacements, or capital improvements that should have been excluded from TY's rate. That is roughly 25% of the total 2025 forecast. That figure is conservative, and TY expects discovery to reveal more mislabeled work.

91. Unsurprisingly, Defendants' 2026 forecast rose by more than $750,000 over the already inflated 2025 forecast.

92. Defendants' scheme is ongoing. TY continues to pay these fraudulently inflated rates—and MLP, Randle, and HWS continue to line their pockets—profiting off the scheme with every bill.

## III. RICO ALLEGATIONS

93. TY incorporates paragraphs 1 through 92.

### A. The Enterprise

94. MLP, HWS, Randle, and Casco together formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). Each is a "person" under 18 U.S.C. § 1961(3) and is legally distinct from the Enterprise.

95. The members of the Enterprise share a common purpose: to deceive TY into paying for capital improvements, replacements, and repairs to the Ditch System. They do this by labeling those costs as "operation and maintenance," building the mislabeled costs into rate forecasts, and billing TY at the inflated rates.

96. That common purpose is different from MLP's and HWS's legitimate business operations. The WDAs allow MLP to recover increases in operation and maintenance costs, and nothing more. They do not allow MLP to recover repair or capital costs under another name. Likewise, the DMSA requires HWS to supply information about maintenance and capital projects. It does not contemplate HWS rewriting that information so MLP can recover—and in turn pay to HWS—costs the WDAs exclude. The Enterprise exists to do what neither contract allows, and what every member profits from: getting work on the Ditch System done at TY's expense.

97. The Enterprise operates through a chain of direction and execution that sits outside the parties' ordinary contract roles. For example:

- Randle decides which excluded costs go into TY's rates.
- Casco tells HWS how to relabel the underlying work.
- HWS relabels the work and sends the revised scopes of work and forecasts back to Randle and Casco.
- MLP uses those materials to set TY's rates, notify TY, bill TY, and collect payment.
- MLP uses the money it collects from TY to pay HWS for the work.

98. Each member participates in operating or managing the Enterprise. For example:

- Randle directed that at least $250,000 of capital improvements and repair work be "included in the water rate amounts." He signed the August 21, 2024 letter announcing the rate increase. He also signed the October 23, 2024 letter that purported to justify the rate increase based on claimed "operation and maintenance" costs. *See* Exhibit 2.
- Casco directed HWS to relabel repairs as maintenance and personally redlined HWS's scope of work to do so. *See* Exhibit 1.

- HWS, through its Operations Manager, John Kadowaki, rewrote its own scope of work to implement Casco's relabeling, preserved one "repair" label, and on May 6, 2025, sent the relabeled materials and the 2025 forecast spreadsheet to Randle and Casco.
- MLP controls the Ditch System, adopts the forecasts, sets and imposes TY's rates, sends the rate notices, and collects TY's payments.

99. The Enterprise has operated as a continuing unit from at least August 2024 to the present. It began when Randle asked TY to let MLP pass through repair and capital costs. MLP, HWS, Casco, and Randle then devised a plan to impose those costs anyway, without TY's agreement or knowledge. The Enterprise has continued through the September and November 2024 rate increase notices, the May 2025 relabeling, and the July 2026 rate increase notice, and it continues with each bill TY pays at those rates.

100. The Enterprise's conduct spans more than two years and includes multiple rate changes, communications, work classifications, forecasts, and payments. It continues today.

101. The Enterprise is engaged in, and its activities affect, interstate commerce.

- MLP is incorporated in Delaware and its shares trade on the New York Stock Exchange.
- HWS is a subsidiary of California Water Service Group, which is headquartered in San Jose, California.
- The Enterprise's members communicate through and conduct the Enterprise through interstate wires and the U.S. Mail.
- TY's Courses and the Golf Academy, which receive non-potable water from MLP, draw visitors, including professional golfers competing in PGA and LPGA events, from around the world.
- The Enterprise's charges are billed through interstate wires and through the U.S. Mail.

**B. <u>Pattern of Racketeering Activity</u>**

**1. <u>Predicate acts of wire fraud</u>.**

102. Each communication below was sent by interstate wire—email processed through data centers and other communications infrastructure in other states—in interstate commerce in furtherance of the scheme to defraud described above. Each is a separate violation of 18 U.S.C. § 1343.

103. **August 21, 2024 Randle letter.** On August 21, 2024, Randle emailed TY a signed letter stating that "[d]ue to increased operation and maintenance costs of the system as compared to available water, water delivery charges will be

increasing for all users." In the same letter, Randle asked TY to amend the WDAs so MLP could pass through capital and repair costs. That letter was materially misleading. Randle knew the rate increase would also recover capital, repair, and replacement costs.

104. **September 12, 2024 rate notice.** On September 12, 2024, Kodama emailed TY a notice stating that TY's rate would increase effective November 1, 2024. The notice attached an "operation and maintenance" forecast that included hundreds of thousands of dollars in costs that in fact were not for operation and maintenance but were falsely labeled as such.

105. **October 23, 2024 Randle letter.** On October 23, 2024, Randle emailed TY a signed letter purporting to justify the increase described in the September notice. The letter repeated the false forecast and described its components falsely. For example, it stated that the $300,000 "Road Maintenance" line item consisted primarily of vegetation management. That concealed that the forecast included significant amounts for road repair and improvement, among other repair, replacement, and capital improvement costs.

106. **November 29, 2024 rate notice.** On November 29, 2024, MLP emailed TY a second "supersed[ing]" rate notice, effective January 1, 2025. The notice again falsely represented that the rate increase was based solely on increased operation and maintenance costs, and it attached a 2025 forecast that incorporated

hundreds of thousands of dollars in *other* costs that were falsely labeled as operation and maintenance.

107. **May 1, 2025 call.** On or around May 1, 2025, Casco and Kadowaki discussed on a call changing all instances of "repair" to "maintenance" in HWS's 2025 scope of work. The call and Casco's instructions were then memorialized in the emails below.

108. **May 1, 2025 Casco email.** On May 1, 2025, Casco emailed Kadowaki about HWS's draft 2025 scope of work and budget. He instructed: "Change all 'Corrective Maintenance' or 'Repairs' to Deferred Maintenance." *See* Exhibit 1.

109. **May 2, 2025 Casco redline.** On May 2, 2025, Casco emailed Kadowaki a redlined scope of work. The redlines replaced every instance of "repairs" with "maintenance" or "deferred maintenance." Casco's comment read: "Changed any 'repairs' language to maintenance or deferred maintenance." *See* Exhibit 1.

110. **May 6, 2025 HWS email.** On May 6, 2025, Kadowaki emailed Randle and Casco. The email attached the final scope of work, which incorporated Casco's relabeling, and the 2025 forecast spreadsheet. Among other falsely labeled line items, the spreadsheet listed $250,000 for purported "Road Maintenance" that was not maintenance at all. This line item was "[a]dded by MLP and included in water rate amounts. Based on discussion with RR [Randle]."

111. **June 1, 2026 rate notice.** On June 1, 2026, Kodama emailed TY a further rate notice, effective July 1, 2026. It was based on a 2026 forecast of approximately $2.5 million. On information and belief, that forecast again includes capital improvement and repair costs falsely labeled as operation and maintenance.

112. **Monthly invoices.** MLP has sent TY monthly invoices by email, billing TY at inflated rates. Each invoice is a separate use of the wires in furtherance of the scheme. These include invoices dated August 31, October 8, October 31, December 1, and December 31, 2025, as well as January 31, February 28, March 31, April 30, May 31, June 30, and July 31, 2026.

**2. <u>Predicate acts of mail fraud</u>.**

113. For at least part of the relevant period, MLP also sent invoices to TY by U.S. Mail, billing TY at the fraudulently inflated rates. These include invoices dated January 31, February 28, March 31, April 30, May 31, June 30, and July 31, 2025. Each mailing is a separate violation of 18 U.S.C. § 1341.

**3. <u>Pattern</u>.**

114. **Relatedness.** The predicate acts are related. They share:

- the same purpose: to make TY pay for costs the WDAs exclude;
- the same victim: TY;
- the same participants: MLP, Randle, Casco, and HWS;

- the same method: relabeling excluded costs as operation and maintenance; and
- the same result: unjustified, inflated rates paid by TY.

115. **Closed-ended continuity.** The predicate acts span about two years, from August 2024 to at least July 2026. They include:

- two separate rate increases, imposed by different notices more than a year apart;
- follow-up letters defending those increases;
- relabeling HWS's work records in May 2025, carried out by MLP and HWS personnel; and
- monthly invoices, each paid separately.

116. **Open-ended continuity.** The scheme also threatens to continue. Defendants have already raised TY's rates by 339% through successive increases over the past two years, each built on the prior year's fraudulent forecast. MLP continues to bill TY at those fraudulently increased rates every month.

117. Most recently, TY's rates were increased just a few months ago based on absurdly high purported "operation and maintenance" 2026 cost forecasts provided by MLP.

118. Despite TY's repeated requests, to date, Defendants have withheld nearly all supporting information for the forecasts, concealing the scheme, delaying its discovery, and preventing it from being stopped.

119. The Ditch System still needs substantial repair, so Defendants have reason to continue with their plot.

120. TY is entirely dependent on MLP for an essential resource without which it cannot operate: irrigation water. Defendants have taken advantage of this reality, knowing that TY has no choice but to pay the fraudulent rate increases. Unless stopped, Defendants will continue cheating TY with each new forecast and each new bill.

#### 4. Intent.

121. Each Defendant acted knowingly and with specific intent to defraud TY. For example:

122. **Randle** knew the WDAs barred MLP from charging TY for capital improvements, replacements, and repairs. That is why, on August 21, 2024, he asked TY to amend the WDAs. MLP did not wait for TY's agreement, and Randle personally directed that capital improvements, replacements, or repairs be included in TY's rates anyway, including $250,000 of capital improvements and repair work on roads. He also signed the October 23, 2024 letter in which he falsely claimed

that MLP's forecast of $1,794,300 consisted solely of operation and maintenance costs.

123. **Casco** told HWS to change the labels on the work, not the work itself. His own comment shows he did this on purpose: "Changed any 'repairs' language to maintenance or deferred maintenance." The labels mattered for one reason: the WDAs treat maintenance and repairs differently.

124. **HWS**, through its Operations Manager, John Kadowaki, knew that the work Casco relabeled was repair work. HWS had maintained the Ditch System for years, was very familiar with its condition, and described the planned work as "repair" in its own draft scope of work. HWS nonetheless adopted Casco's changes, falsely relabeled all of the repairs as maintenance, and sent the relabeled materials back to MLP's senior executives. HWS was aware of the WDAs between MLP and TY and was aware of the significance in changing "repair" to "maintenance." HWS implemented these changes with the intent that TY would pay the costs.

125. **MLP**, acting through Randle, Casco, and Kodama, described these costs to TY as operation and maintenance, even though it knew they were not.

126. TY was the intended target of every one of these misrepresentations, TY paid the resulting charges, and TY continues to pay the increased charges through the filing of this Complaint.

### C. TY's Injury

127. TY has suffered, and continues to suffer, injury to its business and property. Since January 1, 2025, TY has paid MLP inflated rates that include costs the WDAs bar MLP from charging.

128. Based on the line items identified so far, at least 25% (or $447,000) of MLP's 2025 forecast used to justify its rate increases was fraudulently mislabeled.

129. TY's injury arises from fraud, not merely from breach. TY paid because Defendants affirmatively misrepresented what the charges were for and concealed the truth by rewriting the underlying work records. TY could not have discovered what it was really paying for until, at the earliest, it obtained internal MLP and HWS records in April 2026 through discovery in a separate lawsuit.

130. TY's injury is ongoing. Each new bill at the inflated rates adds to it, and it will keep growing unless and until the Court intervenes.

131. **Causation.** Defendants' racketeering activity is the but-for and proximate cause of TY's injury.

132. The causal chain is short and direct:

- Randle directed that the excluded costs go into TY's rates.
- Casco directed the relabeling.
- HWS carried it out.

- Defendants misrepresented to TY in signed letters, rate notices, and supporting documents that the increases reflected only operation and maintenance costs.
- MLP built those costs into forecasts and rate notices and billed TY.
- TY paid MLP in reliance on Defendants' representations that the increases reflected operation and maintenance costs.
- MLP then paid HWS to perform work that should have been classified as repair, replacement, and capital expenses, but which was illegally labeled as "maintenance."

133. But for the fraudulent classifications and representations, TY would not have paid the challenged amounts.

134. TY is the direct victim, and no intervening party stands between Defendants' conduct and TY's loss.

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Conducting an Enterprise Through a Pattern of Racketeering Activity)**
**(Against All Defendants)**

135. TY incorporates paragraphs 1 through 134.

136. Each Defendant is a "person" under 18 U.S.C. § 1961(3).

137. The Enterprise is an association-in-fact enterprise under 18 U.S.C. § 1961(4). It is engaged in, and its activities affect, interstate commerce. *See, e.g.*, ¶ 101.

138. Each Defendant is associated with the Enterprise. Each has conducted or participated, directly or indirectly, in conducting the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). *See, e.g.*, ¶¶ 94-126. Among other things:

- MLP emailed TY rate-change notices and letters that relied on false forecasts of operation and maintenance costs to justify astronomical rate increases.
- Randle personally signed two of those letters and personally directed that the amount for capital road work, unrecoverable from TY, be passed on to TY in the water rates.
- Casco directed HWS via email to change all "Corrective Maintenance" or "Repairs" to "Deferred Maintenance" on May 1, 2025.
- HWS revised its scope of work to falsely represent that certain repairs were instead maintenance.

139. The pattern of racketeering activity, as described throughout this Complaint, consists of the following predicate acts:

- Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud TY out of money or property by means of materially false representations, *see, e.g.*, ¶¶ 102-12;
- Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud TY out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations, *see, e.g.*, ¶ 113.

140. Each predicate act is a "racketeering activity" under 18 U.S.C. § 1961. The acts are related, and they show both closed-ended and open-ended continuity. *See, e.g.*, ¶¶ 114-20.

141. Each of these Defendants knowingly and willfully associated with the Enterprise and conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity. *See, e.g.*, ¶¶ 121-26.

142. On information and belief, Defendants have committed additional predicate acts of the same kind, including sending other fraudulent invoices, forecasts, and communications through email and U.S. Mail. Evidence of these

additional predicate acts are in Defendants' possession and will be identified in discovery.

143. TY has been injured in its business and property by reason of Defendants' violation of 18 U.S.C. § 1962(c). The injury is ongoing. *See, e.g.*, ¶¶ 127-34.

144. Under 18 U.S.C. § 1964(c), TY is entitled to treble damages, costs, and reasonable attorneys' fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(RICO CONSPIRACY)**
**(Against All Defendants)**

145. TY incorporates paragraphs 1 through 144.

146. For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and/or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d). *See, e.g.*, ¶¶ 75-90.

147. This pattern of racketeering activity in which the Defendants intentionally conspired to engage involved the specific acts as described in detail in this complaint constituting wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341.

148. All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B). *See, e.g.*, ¶¶ 102-13.

149. TY has been injured in its business or property by reason of the above-described conduct. *See, e.g.*, ¶¶ 127-34.

150. By reason of its injury, TY is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**FRAUD**
**(Against All Defendants)**

151. TY incorporates by reference and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

152. Under Hawai'i law, a claim for fraud requires proof that: (1) the defendant made false representations of a material fact; (2) the defendant knew the representations were false, or made them recklessly without knowledge of their truth; (3) the defendant made the representations with the intent to induce the plaintiff to act in reliance thereon; (4) the plaintiff justifiably relied on the representations; and (5) the plaintiff suffered damages as a result of such reliance. *Shoppe v. Gucci Am., Inc.*, 14 P.3d 1049, 1067 (Haw. 2000).

153. MLP, Randle, Casco, and HWS made false representations of material fact with the intent that TY would rely on those representations. *See, e.g.*, ¶¶ 54-65, 75-92, 121-26.

154. For example, MLP, through Randle and Casco, and HWS represented to TY through invoices, rate adjustment notices, and supporting documentation that the rate increases imposed beginning in January 2025 were based on legitimate increases in "operations and maintenance" costs, as those terms are used in the WDAs. In truth, and as Defendants knew, hundreds of thousands of dollars of the costs supporting those rate increases were capital improvements, replacements, and repairs that MLP was contractually prohibited from passing through to TY.

155. MLP further represented to TY that a $300,000 "Road Maintenance" line item consisted of vegetation management. In reality, much of that line item was for repair and capital improvements that were "[a]dded by MLP and included in the water rate amounts" "[b]ased on discussion with RR"—i.e., Race Randle, MLP's CEO.

156. HWS revised the scope of work documents to implement the proposed revisions so that the documents represented that certain capital improvement, replacement, and repair costs were operation and maintenance costs. HWS did so knowing and with the intent that the doctored documents, the misrepresentations in the doctored documents, or both would be conveyed by MLP to TY, that TY would rely on the representations in those documents, and that TY would pay accordingly. *See, e.g.*, ¶¶ 18-22, 124.

157. Defendants knew that these representations were false or made them recklessly without knowledge of their truth. *See, e.g.*, ¶¶ 18-22, 121-26.

158. For example, Casco's May 1, 2025 directive to HWS to "[c]hange all 'Corrective Maintenance' or 'Repairs' to Deferred Maintenance," his systematic redlining of the HWS scope of work documents the very next day, and HWS's discussions of, confirmation of, and implementation of Casco's directions demonstrate that Defendants knew that the underlying work constituted repairs and capital improvements—not operations and maintenance—and intentionally relabeled them to deceive TY and other customers.

159. Defendants made these false representations with the intent to induce TY to pay the inflated water rates without objection. *See, e.g.*, ¶¶ 121-26.

160. TY justifiably relied on Defendants' representations regarding the nature and classification of the expenses underlying the rate increases. T Y paid the inflated rates based on Defendants' representations that the charges reflected legitimate operations and maintenance costs, as permitted under the WDAs.

161. As a direct and proximate result of Defendants' fraud, TY has been damaged in an amount to be proven at trial, including by paying water rates that were unlawfully inflated by the inclusion of costs that Defendants falsely stated were not included.

## PRAYER FOR RELIEF

TY requests judgment against Defendants and asks the Court to award:

- Actual damages for TY's injury to business and property, including reimbursement for TY's payments to date, in an amount to be proven at trial;
- Treble damages under 18 U.S.C. § 1964(c);
- The costs of suit and reasonable attorney's fees under 18 U.S.C. § 1964(c) and any other applicable statute or doctrine;
- Prejudgment and post-judgment interest as allowed by law;
- Appropriate injunctive relief preventing further fraud and further collection of rates based on fraudulent cost classifications;
- Declaratory relief that Defendants' conduct constitutes fraud and violates 18 U.S.C. § 1962; and
- Such other and further relief as the Court deems just and proper.

## JURY DEMAND

TY demands a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: Honolulu, Hawaiʻi, October 14, 2026.

**LUNG ROSE VOSS & WAGNILD**

By: */s/ Grant F. Allison*

Grant F. Allison (10368-0)
Ivana P. Tran (11758-0)
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813
Telephone: (808) 523-9000

**ASHURST PERKINS COIE US LLP**

By: */s/ Jean-Jacques Cabou*

Jean-Jacques Cabou*
Margo R. Casselman*
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: (602) 351-8000

** Pro Hac Vice forthcoming*

*Attorneys for Plaintiff TY Management Corporation*